Good morning, your honors. I please the court. My name is Stan Casper. I represent Greg and Ann Clouthier. In my view, we're here because there are a multitude of legal issues that are in dispute that are far sufficient to preclude summary judgment. I think we've done this in our brief, but I want to be clear here. For purposes of argument, we're going to assume that the Eighth Amendment standard under Farmer applies in terms of defining deliberate indifference for both the individual defendants. Well, we could spend, obviously, a lot of time looking at the language in the cases that we did cite, which clearly seems to suggest that Eighth Amendment and the fact that it addresses punishments and not conditions doesn't apply to pretrial detainees. I'm not going to go there now. That's for you guys, if you want to do anything about that. But using Farmer v. Brennan, unlike any case that either side has cited in their very extensive briefs, I don't think there's an individual such as Robert Clouthier that the county in this case knew as much about, both specifically and definitively, in terms of his suicidality. I mean, the record is replete. Ten prior suicide attempts, as indicated in the initial questionnaire. Multiple prior hospitalizations. He refused the night of his arrest to even be stitched up. He was in jail, bleeding profusely, according to Nurse Hannaway. Hannaway, who's the mental health specialist who sees him the first day, has the most interaction, repeatedly perceives him as one of the most suicidal inmates she has ever seen. She goes to everyone, that is, mental health staff, sheriffs, before she ends her shift, and she says, he is a real threat. The terms she uses is, this is the real deal. And that included mental health specialist Blush. I think we all realize that, but we have to sort out whether Blush, Steele, and Foley should be in the soup, so to speak, and whether the county, under some failure to properly train, should be implicated. Maybe you should focus directly on each of these three people and tell me why you think that that should be a matter for the jury to sort out. I think first and foremost, because you have this absolute, irreconcilable difference between the testimony of Foley and Blush, in terms of deliberate indifference, this is not something that can be resolved short of a jury trial. Blush says the following, and by the way, this is contrary to the self-serving declaration that subsequently gets inserted by the county and argued at the motion. We look at her deposition and her testimony. She says, I believe that he was unable to be removed from that room, from the actual observation room. He is to be kept there. She tells Foley that. She specifically says that I didn't leave until Foley reacted to me and said, hey, I'm sitting right here. She found that he wasn't able to have utensils, free time, and he wasn't to be removed until there was further evaluation. So why does that implicate Blush then? That seems to suggest that Foley would be responsible. I totally agree with you except for one thing. Foley says it didn't happen. She didn't tell me that. Well, Blush took him off the observation log. Yes. And then Foley left him in the observation room. Then Foley leaves duty, Steele comes on. By the time Foley comes back, Clovier is in the general population. Correct. Isn't that right? That's correct. So whenever Foley was told, he really, there was nothing he was doing at that point. He was off duty. It was Steele that was on. It was Blush who took him off the observation log. But the observation log clearly does not take someone out of the observation room. Isn't that one of the problems here is the conflict of policy of whether you can be in the room if you're not on the log? That's right. That's right. So one question I have is you do seem like you have Blush, as I said, leave him in the observation room. Foley said, no, I didn't get told that. So that can't both be true. We know that. So we have kind of dueling witnesses. Right. But Foley said there isn't a notation on the log that says release from the S log. That's just the suicide log. That is what we're talking about. Is that the log? I mean, they say, well, we don't use this word S log. My understanding is that means precisely what you were just saying, that Blush released him from the suicide log. She had no intention, says she, of releasing him from the observation room. Under no circumstances was he to be released. But then, of course, Foley said, no, that's not what she told me. That's right. So then Foley goes off duty, as Judge Akuta says, and in comes the third person. Yeah. I mean, unless you, like the district judge, can make that decision, who's telling the truth or who's not, I don't see how we escape the jury having to make that decision. I guess even if we resolve those disputes in favor of the plaintiff, we're looking here for deliberate indifference. So we'd have to say Foley, you know, having been told he should stay in the observation room, he left him in the observation room, that Foley somehow knew that he was posing a substantial risk of harm to Clothier and nevertheless intentionally leaves. I can't see how that implicates in even resolving those disputes in favor of the plaintiff. Well, I believe it is in this way. Under Farmer, we've got the known risk of harm, and the question is, what did the individual, in this case Foley, do to reasonably respond to the danger? What he's supposed to do and what the testimony says he's supposed to do is he's supposed to enter it in the red book. He is supposed to make a notation. This is not just, oh, she told me this so I can finish out my tour of duty and go off for three days. He's supposed to put that information in the red book so that the subsequent jailers who come on will see, per blush, not to be removed from observation room. He didn't do anything that he was supposed to do, and he certainly didn't act reasonably under Farmer. That's the principal way. Let's throw with Foley in the sense that if, in fact, she said to leave him in there and Foley did that, his malfeasance, if there is some, is not making the log entry, correct? Primarily correct. Okay. So then we'd have to figure out, does that rise to the level of an Eighth Amendment violation? Let me point out that one of the ways in which you can determine an Eighth Amendment violation and a Farmer violation, according to the Gibson case, which I think is most instructive, it's a Ninth Circuit case and it clearly, I think, controls much of... Which case? Gibson. Okay. The Gibson v. Washoe. If the county or the entity has taken the time to determine and make regulations, they, in fact, have decided that there is a big risk here. They have acknowledged the danger of the risk. And in this case, one of the policies they adopted was that the deputies are supposed to write anything out of the ordinary in the red book. It's the only way that the deputies coming behind, the deputy taking a particular, you know, what's the word? Finishing their tour of duty. It's the only way that the deputies, the other deputies, will know anything. I mean, how could you possibly know what was in the mind of Foley unless Foley puts it in the red book? He's supposed to put it in the red book. Can you just go back a step? Sure. I just wanted to see whether you could clarify something for me. I'm not so sure I fully understand the nexus between the observation log and the observation room. Somebody is in the observation room to begin with because of their suicidal history. Right. And then on top of that, there is an observation log, which I guess is just a record book, right? That's right. The professionals are supposed to make notations in periodically to track the person's behavior while they're in the observation room, right? It is an extra precaution. It is clearly designed, if you do both things, there's- So then Blush comes along and says, Well, I don't think I have to make those written entries in the observation log anymore. It doesn't mean I'm authorizing that he should no longer be observed or kept in the observation room. But for some reason, she didn't think it was necessary to continue to monitor him or to make entries. How does that work? I'm not clear about that. Because she's thinking, you know, this is a big pain in the rear to have the deputy half to every 15 minutes or 10 minutes, whatever the rule says about putting in the log. Because the reality is we're talking about the deputy station here. The room is right here with seven-foot glass. You're looking- This guy is such an obvious suicidal problem. I don't have to go ahead and gild the lily anymore. It's clear to everybody this guy has to be under observation. And he will be under observation. There's no ifs, ands, or buts about it because he's in the observation room. Now tell me about this red book. Let's just step back one step. And that's where it also gets confusing because I thought she also said she thought he wasn't suicidal at that point. No, no, no, no. Okay. And this is a very big mischaracterization in my view of what the county has said. There is a self-serving declaration they put in at the last minute that is totally contrary to what she says in her deposition, to what she says at the coroner's hearing. What she says is he could still go either way. I had determined that he was not going to leave that observation room before he was further evaluated. He was still in such a state that I told the deputy no utensils, no free time. And so this business about she determined at some point that he was no longer suicidal is totally belied by the real testimony, the real time. In other words, another factual issue. Exactly. In terms of summary judgment considerations, yes. So go forward. We have the observation log. You've explained that. We have the observation room. I think we understand that. Now, on top of that, you have this red book that's a separate record that has to be kept by deputies. That's right. And the red book is a computer entry. It is for the sheriffs and only for the sheriffs' eyes. I mean, this is another point that we make in terms of the training issues and the disconnect between the, you know, mental health staff and the sheriffs that are deputies that are supposedly working here. The deputies are supposed to make entries in the red book periodically under what circumstances? Under anything that would communicate to the sheriffs coming behind them of anything they should know. There's a trail, so there's a proper continuum. Absolutely. Absolutely. And it's throughout the record in the excerpted record that this was something that they were supposedly trained to do. Did you want to save some time for a rebuttal? I did. Okay, then you have a minute and a half left. Bye-bye. Good morning. May it please the Court. I'm Janet Holmes, Deputy County Counsel. And I want to begin by saying the clothiers are here, and this is a very, very tragic event. And nothing can take away from the tragedy that occurred here. I think everybody involved in this litigation wishes we could turn the clock back and prevent the suicide. But unfortunately we don't. Do you think that summary judgment was warranted considering the standard by which you measure summary judgment, that there are no disputed issues of fact in respect to the county's training scenario, either of these individual people, that absolutely no disputed issue of fact for jury to resolve? Is that your position? Absolutely not. It's our position that there's no material fact that's in dispute. And that's where I think the two parties differ considerably. Let me ask you one pointed question, if I can do that. Sure. As I read the record here, it seems as if there's evidence that deputies were trained, that a detainee's removal from the observation log meant that the detainee could be removed to the general population, while the mental health staff was trained that removal from the log was not sufficient, and written authorization from the mental health specialist was required to take a detainee out of the observation room. It seems that you have inconsistent policies, you have a lot of confusion here, which may have led to all of the imbroglio that we spoke about here when we questioned the appellant's counsel. Isn't that really something that the jury should listen to and decide whether there was failure to train or confusion in terms of the custom and policies and practices? How can we decide that as a matter of law? Well, I think the Court makes a good point, but the problem is this. Does that rise to the level of deliberate indifference? There is no evidence at all that custody staff ---- You need deliberate failure to train. I don't think you need deliberate indifference, first of all, right? Okay. Okay. There was ample training. The problem was there was a lack of awareness that there was a conflict perhaps in the training or confusion. That seems to me to be precisely the problem here is that it's rare you get experts who come in and then you look at the policy and then you have the deputies testify. Well, actually, that's sort of how the deputies viewed it, and that's how the mental health people viewed it, and never the twain shall meet. Isn't that the problem here? I think that in terms of the Monell liability, clearly, that's the problem. I think that doesn't ---- So you concede, then, that there could be Monell liability here, and that would be for the jury to determine. No, I don't concede that. What I concede is that's the heart of the issue on the Monell liability. But I think it has little, if anything, to do with liability for the deputies and for Margaret Blush. Right. But that is about as clear a conflict in procedure as I've seen in one of these kind of cases, where you just basically have the two policies and the two sides kind of shooting at each other in terms of what their understanding is. So the question is, with those kind of factual issues, and with people not knowing and understanding on a consistent basis, why isn't that, why doesn't that rise to the level under Monell of this failure to train, failure to execute a policy as delivered? Because there's a causation problem, and that's the real issue that the timeframes here are involved in. Blush takes him off the observation log five days before the suicide attempt. There are other mental health care professionals who are on site every day. We have two days later Victoria Blush seeing him, I'm sorry, Victoria Brown seeing him, doing nothing different. He's off the log. He's in the room. And so there is a time gap here. Right, but isn't that, it's a factual issue as to whether, you know, you sort of have one of these things, had he been left in the observation room, whether he was on the log or not, but he'd been left in the observation room without access to what he has in his cell, would he have committed suicide? Isn't that a big factual issue? Well, the problem is there's no evidence of what he had access to in his cell, in the observation room, versus the other cell. So he could, and frankly, the 15-minute log is the difference between the observation cell and the other cell. There is evidence that the cells are very close together. Right, but that's a big difference when you have a suicidal patient. But the problem is, in terms of the factual issue there, that Foley saw him 15 minutes before he was found hanging. So if he had been on the log, arguably he'd have been seen every 15 minutes, but it wouldn't have made any difference because it was only 15 minutes between when Foley last saw him and then found him hanging and resuscitated him. What do you make of the fact that Robert Selmate allegedly, you know, is willing to testify that he saw Foley's sheets tied in a knot, and that arguably, you know, I'm sorry, not Foley's sheets, Clothier said that Foley should have observed that? Well, coulda, woulda, shoulda, this is an inmate trying to say that, and he doesn't say, and so I think this is very significant. Mark Watkins does not say in his declaration, and will not say, he did, Foley did see this. Watkins said he should have seen it. And he didn't say that.  that would agree with that. And isn't that all part of the factual mix really. We're talking about summary judgment here. It may well be that a jury could agree with that. It may be that a jury could discount the testimony of the Selmate, but isn't this all part of a factual scenario that defies granting summary judgment as a matter of law? Well, there are a lot of facts before the court, but I submit to the court that even evaluating all the facts in the plaintiff's favor, there just cannot be any finding of liability, in particular against these individually named defendants. There's no deliberate indifference. Perhaps there's some element of negligence on Blush's part that she didn't write something down or whatever. And let me make another important point about Blush. Blush told Foley apparently that, you know, he's not to be removed. Foley denies it. Have you been told that? How can we decide that on a summary judgment basis? Blush told Foley. So you have to look at the whole facts. But Blush told Foley he needs to be looked at, he should remain in the observation room until he is seen again by mental health. And there's a note in the record that reflects that. That's the mental health note that Margaret Blush made. And he was seen again by mental health. And by the time Foley comes back on shift, it didn't surprise him a bit that he wasn't, that Clothier wasn't in the observation room anymore because four days had elapsed and mental health had seen him. So let's go then to Steele, and this is where we run into this training collision. He released Robert from the observation room, but he doesn't clear it with mental health, and he says, well, he was off the observation log, so therefore, I guess he's not a danger to himself. So now we're back to, she's saying, well, I'm going to take him off the log, but you must keep him in the observation room until he's seen. Isn't that precisely the problem? It's like one hand doesn't know what the other is doing now that we're at Steele. But he was seen again by mental health. He was seen by Victoria Brown. And so, and you have to understand kind of the separation of powers here, and this is a great effort that I think the county has made. Mental health is taken care of by mental health, and custody is taken care of by the custody staff. We have elaborate policies here in the excerpt of record at pages 660 at SEC, elaborate policies to address these kinds of issues, and mental health is taking care of mental health issues. But it doesn't matter. You know, apparently there's a policy that you need written authorization from a mental health specialist to take a person out of the observation room. That did not happen here, did it? Well, he was taken off of the observation log. Where was the written authorization for mental health if we believe that that was the policy? Well, Ms. Blush signed on the observation log taking him off the log, which meant that he could be kept in the observation room. Off the log. I'm talking about the observation room. The log and the room are coextensive. Well, wait a minute. They don't agree on that. Where do you get that from? Well, Blush, that's what Blush apparently said, perhaps, you know, feeling some element of guilt when she was at the coroner's in-camp quest. But if you look at the policy, it does suggest that they are coextensive. The log and the room are coextensive. It just seems that the more we talk about this, the more at least I am personally convinced, to be fair with you, that these are matters of fact. That's the province of injury and not a certain court of appeals. If we resolve all these facts in favor of the plaintiff, which is what we need to do in the summary judgment, why is there not deliberate indifference on the part of, let's go through Foley, Steele, and the county? Could you just walk through that for me? Okay. You want me to set aside Blush for a minute? Set aside Blush. All right. So we'll start with Foley. He's on the night that Blush takes Clothier off the observation log. Blush makes a note. Apparently, he fails to make a little note in the red book. I don't know how that can be. Why isn't that deliberate indifference? Well, because there's no connection between failing to make a note in the red book and an ultimate suicide attempt. All he would have put in the red book was nurse Blush took him off the observation log, right? I mean, what else would he have put in there? Well, she says she told him to keep him in the observation log. Until he was seen again by mental health, which he was two days later. So we don't know what happened there. I mean, we don't have all the facts before us as to what was said, what mental health did, what mental health did not do, whether he should be in the observation log, whether he should be in the observation room, what these people observed, what they wrote down, what they should not have written down. This is dense with all these factual dynamics. I think it is in the record. We have Victoria Brown's declaration. We have the declaration of Blush and her log that says very explicitly, and I can give you the site, her log says very explicitly that she, I believe it's at 535, it's set in the excerpt of record, that he is to be left in the observation log until seen by mental health again. Now, presumably, once he's seen by mental health, all bets are off, unless Victoria Brown issues special instructions and the policy provides for that. If she gives special written instructions for special supervision, that does need to take place. You still don't have the written authorization here. That seems to be required by mental health. The sign-off was the written authorization. Well, you said to be seen by mental health, but after that you still need written authorization according to your policies. Well, what's required for written authorization is if there is to be special supervision. It's kind of the opposite. Let me move forward real quickly to Steele. Let me ask you this. Yes. If the deputies were trained to obtain written authorization, if they failed to do so, would there not be deliberate indifference? If they were trained to receive the written authorization. Let's assume there's training. Let's assume that policy is a correct policy, that you do not remove someone from the observation room without written authorization from a mental health specialist. Presumably the deputies were trained or should have been trained, you know, about that. If they knew that and were trained and did not obtain written authorization, would that not be deliberate indifference? But if they understood her signing off on the observation log was the written authorization that they were required, and that's what qualified immunity is all about. You can make that determination as a matter of law. Okay. Second issue. And then with respect to Steele, he comes on, there's no observation log, and, you know, there's an abundance of effort to interact. He probably spent more time with Robert Clothier than anybody else did during this entire stay of five days. Working with him, I think the declaration and the deposition, for that matter, abundantly clear he spent time trying to evaluate him. He's not required to be prescient. He's not required to be a guarantor of inmate health or safety or prevention of suicide attempts. There's no question that Steele bent over backwards to try to help this man. And then finally, with respect to the county, I just ---- So let me just get what you're talking about, Mr. Steele. Yes. So he releases him from the observation room, but he doesn't clear it with mental health, correct? That's right. And he says, well, that's because since he's not on the log, he must be okay. That's right. But that's not actually the reality. I mean, that's what he thinks, but he doesn't have any clearance of what the mental status is. Well, his understanding is, based on his experience and it's set forth in his declaration, that Clothier is no longer suicidal, actively suicidal, because he's been taken off the log by Blush. And mental health has been in and seen him. I think you're going around in concentric circles. Go ahead. Anything else? I think you're going around in concentric circles. Anything else? So assuming that Steele should have known that without some sort of formal sign-off that he shouldn't have released him from the observation log, and if we resolve the factual disputes, that's what we would have to conclude for purposes of summary judgment, why does that not constitute deliberate indifference? Well, I think it's clear from the record that his understanding, and there's no debate about what his understanding was, that his understanding, and there is a subjective component to the deliberate indifference standard. So he made a mistake, but it wasn't an intentional disregard of a risk. In other words, you're saying he would get qualified immunity. Exactly. He might have made a constitutional error, but given the circumstances, it's not one he would have understood. And his understanding. And I think ultimately, and I know my time is up, but qualified immunity is absolutely the most important thing that we haven't talked about today in terms of resolution of this case, particularly on the parts of the individually named defendants. Thank you. Thank you. A minute and a half, Your Honors. A minute and a half. Okay. I want to talk about causation real quickly. All of the argument by counsel ignores the testimony of the expert, Ken Gottlieb, who's a psychiatrist who testified without objection that Robert Clothier, and by the way, Gottlieb's credentials are longtime history of working in inpatient psychiatric units just like this, that Robert exhibited ongoing and imminent suicidality during the entire period of his detention. Just another fact that is out there that I believe can't be resolved at this juncture. The farmer standard that it doesn't matter if the facts were clear, the individual actually has to know them. So it doesn't really matter unless there's evidence that Foley, Steele, et cetera, actually knew that he was suicidal. That's correct. I mean, it is subjective knowledge. He had to know. But we have evidence that he did because he was told. Yeah, because Blush told him. You don't have to. Let's just take the last individual we spoke about, Mr. Steele. Okay. So he's there. He's been dealing with Mr. Clothier. Let me tell you why I think he is also... Why he doesn't get qualified immunity. Okay. Because, first of all, we've got the historical facts that are totally at odds. Mr. Steele says that he thinks Robert Clothier is getting better. That's his testimony. On the other hand, that is totally contradictory to, counsel kept referring to Victoria Brown, the subsequent mental health evaluator. All Victoria Brown does is come in and says, this guy still looked acute. He looked like he had been put through the wringer. He looked like, in my opinion, he could not be, and let me quote you exactly, I did not feel he was ready to leave the observation room at this time. That's Victoria Brown. She sees him on the 29th, the same day that Steele claims he sees Mr. Clothier. He talked about qualified immunity, and he said, if I had observed anything that was caused, I would have summoned the mental health people immediately. And he's been spending time with him. So from a qualified immunity standpoint, he might be wrong. I mean, he's not a trained psychiatrist. He's a corrections officer. It's a question of fact as to what he means subjectively. It is a question of fact because we have... Why is it a question of fact? Well, because Brown sees him at the same time and sees someone that looks totally acute, put through the wringer, shell-shocked, someone that is not ready to be released from the observation room. She sees him at the same time that Steele is claiming he looked fine. And on top of that, he was supposed to get written authorization, and the jury could find that that was part of the training, and that's what he was supposed to do. Well, that for sure, Your Honor. There are also some other littler things. He is obligated to write when Robert Clothier, the day before he takes his own life, stops eating, stops taking his meals, stops going out on free time. This is what Steele finds out about. And yet, under the rules, under the regulations, he is supposed to notify mental health because this represents a significant change that could represent suicidality. So once again, where he knew, we say, where he knew, based on what others such as Brown saw, did he take reasonable action? No, he didn't take any reasonable action. On the 31st, he knew that he had skipped two meals in a row, basically starving himself. Right. Skipped his free time. Yeah, and he doesn't tell anybody about it, contrary to the regulations. There is plenty of deliberate indifference, in my view, that would, you know, in regard to Steele, which is who you were talking about. Thank you. Thank you. I thank both of you for your argument this morning. The case just argued of Clothier v. County of Contra Costa is submitted. And we have one last case for argument this morning, and that is United Steel Paper and Forestry v. DNLRB. Thank you. Thank you.
judges: McKeown, Ikuta, Block